Opinion issued May 31,
2012


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-09-00328-CV

———————————

Samson Lone
Star, Limited Partnership n/k/a Samson Lone Star L.L.C., Appellant

V.

Charles G.
Hooks III, Individually and as Independent Executor of the EState of Charles G.
Hooks, Jr., as Trustee of the Scott IRA McKeever Trust and the David Wayne
McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General
Partnership;McKeever Partnership, LTD; Charles G. Hooks III and Sue Ann Hooks,
as Co-Trustees under the Will of Charles G. Hooks, Sr., Appellees



 



 

On Appeal from the 60th District
Court

Jefferson County, Texas



Trial
Court Case No. B173008-B[1]

 



OPINION ON REHEARING

          Following the issuance of our March
1, 2012 opinion and judgment on rehearing, appellant, Samson Lone Star, Limited
Partnership n/k/a Samson Lone Star
L.L.C. (“Samson”), moved for further rehearing on issues relating to the
supersedeas bond and surety.  Appellees,
Charles G. Hooks, et al. (“the Hooks”), moved for further rehearing asking this
Court to clarify its ruling regarding postjudgment interest.  Subsequently, on April 16, 2012, the Hooks
moved for en banc reconsideration of our March 1, 2012 opinion.  We grant both motions for rehearing, withdraw
our opinion and judgment of March 1, 2012, and issue this opinion and judgment
in their stead.  We dismiss the Hooks’
April 16, 2012 motion for en banc reconsideration as moot.[2]

This is an appeal from a final judgment against Samson
for more than $21 million in favor ofthe Hooks.Samson has a number of oil and
gas leases from landowners in Hardin and Jefferson Counties, including the
Hooks. The judgment arises from an oil and gas case in which the Hooks brought
suit against Samson with respect to three oil and gas leases, two in Hardin
County, Texas (the “95-acre Lease” and the “10-acre Lease,”collectively the “Hardin
County Leases”) and one in Jefferson County, Texas (the “Jefferson County Lease”).  The Hooks sued Samsonfor breach of contract,
fraud, fraudulent concealment, statutory fraud, negligent misrepresentation,
violation of the Texas Natural Resources Code by failure to properly pay royalties,
statutory negligence, common law negligence per se, injunctive relief, and
declaratory judgment.

The trial court granted Samson’s motion for partial
summary judgment on whether it had breached certain offset obligations under
the Leases.  It also granted the Hooks’
motions for summary judgment on claims for additional royalties related to theirclaims
of “unpooling” with respect to the Hardin County Leases and breach of the “most
favored nations” clause in both Hardin County Leases and the Jefferson County
Lease.  

          The questions of whether
Samson committed fraud against the Hooks with respect to a well drilled within
the buffer zone of the Hooks’ Jefferson County Lease and whether it underpaid
royaltiesby not paying royalties for “formation production” in all three Leaseswere
tried to a jury.  The trial court rendered
judgment on the verdict, holding Samson liable to the Hooks for fraud and
underpaid royalties, and it entered a final judgment that left intact the
summary judgment in Samson’s favor on offset obligations and the summary
judgments in favor of the Hooks on their unpooling claim and their most favored
nations clause claims.  Samson has
appealed the final judgment, and the Hooks have cross-appealed.

In eight issues, Samson complains that (1) there is
legally and factually insufficient evidence of common law fraud; (2) there is
legally and factually insufficient evidence of statutory fraud; (3) the statute
of limitations bars the Hooks’ fraud claims; (4) there is legally and factually
insufficient evidence to support the jury’s finding on fraud damages; (5) the
trial court erred in interpreting the phrase “formation production” in the
Hooks’ Leases as requiring Samson to pay twice for molecules of gas produced as
condensate; (6) the trial court erred inentering judgment in favor of the Hooks
for additional royalties based on theunpooling issuewith respect to the Hardin
County Leases and on the most favored nations clauses in all three Leases;(7)
the trial court erred in elevating lease provisions into a permanent injunction,
and there is no evidence to support the injunction or attorney’s fees; and (8)
the trial court erred by granting post-judgment interest at the rate of 18%,
compounded annually.[3]

          In a single issue, the Hookscomplain
on cross-appealthat the trial court erred in rendering summary judgment in
favor of Samsonon the issue of whether Samson breached certain offset
obligationsin the Hooks’ leases.  We
affirm the trial court’s summary judgment order in favor of Samson on its
offset obligations.

          With respect to Samson’s
appeal, we affirm the portion of the trial court’s judgment awarding the Hooks
reimbursement for ad valorem taxes as stipulated by the parties, and we reversethe
remainder of the final judgment of the trial court and render judgment that the
Hooks take nothing on those claims.

I.     
SAMSON’S APPEAL

A.  
BACKGROUND

 

1.     The Hooks’ Jefferson County Lease and
the BSM No. 1 Unit

          In 1999, the Hooksentered into the Jefferson County Lease
with Samson.  This lease covered 640
acres owned by the Hooks in the Dyches survey in Jefferson County, Texas and
was bordered by Pine Island Bayou, which also serves as the county line between
Jefferson and Hardin Counties.

Article VI
of the Jefferson County Lease was a section called “Offset Obligations.”  In this section,Samson covenanted to operate
the leased premises as a reasonably prudent operator would and to protect the
leased premises from drainage. Article VI also contained specific obligations
for Samson in case of potential drainage. 
This Article provided that if a gas well were completed within 1,320
feet from the leased premises, then, within 90 days from the date of the sale
of first production from that well, Samson must take one of three actions: (1)
drill an offset well; (2) pay the Hooks“compensatory royalties”—in addition to any royalties currently due—in a sum equal to the royalties that would be
payable under theLease on the production from the adjacent or nearby producing
well as if it had been producing on the leased premises; or (3) release the
offset acreage.[4]The
Jefferson County Lease did not provide for pooling.

          In April 2000, Samson began drilling a gas well, the Black
Stone Minerals No. 1 (the “BSM No. 1 well”),on a tract it owned in Hardin
County adjacent to the Hooks’ 640-acre Jefferson County Lease.  This adjacent tract was located in Hardin
County. The surface drillsite was outside the 1,320-foot buffer zone around the
Hooks’ Jefferson County Lease that triggered Samson’s offset obligations under
Article VI(A) of the Lease. However, the well was a directional well that
slanted away from the surface drillsite. 
Originally, the BSM No. 1well was planned with a bottom hole location 1,080
feet from the Hooks’ lease line on the east, a location within the 1,320-foot
buffer zone of the Hooks’ Jefferson County Lease.  This proposed well location was reflected on
a plat titled “Proposed Well Location [BSM No.]1 Walker Pettitt League, A-43,
Hardin County, Texas,” which was prepared and signed by a third-party surveyor
on March 22, 2000.  The surveyor
certified that “this is a true and correct plat based on a ground survey made
under my supervision on March 22, 2000.” 
This plat was filed with the Railroad Commission of Texas (“Railroad
Commission”).

          The March 22, 2000 plat showed a 704-acre
gas pooling unit (the “BSM No. 1 unit”)designated by Samson that ran along Pine
Island Bayou, the Hardin County/Jefferson County line, on the east.  This line was also the western boundary of
the tract containing the Hooks’ Jefferson County Lease.  The Hooks and their co-owners of the tract on
which their Jefferson County Lease was located were not named as lessors in the
table shown on the plat of the designated unit.An arrow shown on the plat
pointed to the location of the proposed bottom hole about at the beginning of a
line that ran to the eastern line of the unit at Pine Island Bayou, the county
line.  Notations on the plat stated:

The
Proposed Surface Location is:  

630′
FSL x 1600′ FEL Survey

2750′+ Scaled FWL x 3834′ FNL
Unit.

 

The
Proposed Bottom Hole Location is:  

330′
FSL x 330′ FEL Survey

870′+ Scaled FSL x 1080′+ Scaled′
FEL Unit.

 

It is undisputed that “FSL”
meant “From the Southern Line” of the Walker Pettitt Survey, “FNL” meant “From
the Northern Line” of the Survey, and “FEL” meant “From the Eastern Line” of
the Survey, which was the Hardin County/Jefferson County line at Pine Island
Bayou.  Thus, in this notation, the
surface location of the BSM No. 1 well was 1,600 feet from the eastern line of
the survey at Pine Island Bayou, and the proposed bottom hole location was
about 1,080 feet from the eastern line, which marked the western line of the Hooks’
Jefferson County Lease.  The proposed bottom
hole was therefore within the 1,320-foot buffer zone for the Jefferson County
Lease.

Although
the March 22, 2000 plat of the designated BSM No. 1 unit estimated the location
of the proposed bottom hole location of the BSM No. 1 well, the exact bottom
hole location of the well, following drilling, could only be ascertained from a
directional survey.  This survey was
completed in July 2000 and was also filed with the Railroad Commission.  Both parties agree that the survey showed the
BSM No. 1well to be bottomed 1,184 feet from theHooks’ Jefferson County Lease,
within the 1,320-foot buffer zone of the Lease. Thus, Samson had an obligation
under the terms of the “Offset Obligations” in the Hooks’ Jefferson County
Lease to (1) drill an offset well, (2) pay the Hooks “compensatory royalties,”
or (3) release the “offset acreage” within 90 days from the date production was
first “sold, removed, or otherwise marketed” from the well.

The BSM No.
1well was completed in August 2000, and the first gas sales occurred in late October
2000.  Because the bottom hole of the
well was within the 1,320-foot buffer zone of the Hooks’ Jefferson County
Lease, the first gas sales triggered Samson’s offset obligations under the
terms of the Lease.The Hooks complain, and the jury found, however, that Samson
did not follow the provisions in Article VI(A) of the Jefferson County Lease,which
provided that, within 90 days of the first sale of gas from a well within its
buffer zone, Samson must drill an offset well, pay the Hooks compensatory
royalties, or release the offset acreage. 
Instead, the jury found that Samsonattempted to avoid those obligations
by seeking to pool the Hooks’ interest in the production from the BSM No. 1
well with those of other mineral owners, despite the lack of pooling authority
in the Jefferson County Lease, while concealing the bottom hole location of the
BSM No. 1 well.

In December
2000, Samson filed a P-12 “Pooling Authority” form with the Railroad Commission
that reflected a reconfiguredBSM No. 1 pooling unit. By letter, Samson informed
the Commission that a portion of the 704 acres in the original BSM No. 1 unit was
to be put into a separate 308.41-acre pooling unit for theproposed Black Stone
Minerals No. A-1 well (the “BSM A-1 well”).  Attached to the letter was a “Certificate of
Pooling Authority,” which represented the Broussard tract, on which the Hooks’ Jefferson
County Lease lay, as one of the tracts whose mineral-rights owners either had
given Samson pooling authority under an instrument currently in effect or had
pooled their interests into the reconfiguredBSM No. 1 unit. Also attached was a
plat of the redesignated704-acre pooling unit dated November 16, 2000 and certified
by Samson’s land man, Glenn Lanoue.  

The arrows
pointing to the surface and bottom hole locations on the November 16 plat of
the redesignated BSM No. 1 unit were the same as those pointing to the proposed
surface and bottom hole locations on the original March 22, 2000 plat of the
unit.  However, the acreage of the unit hadbeen
changed to show a different 704-acre configuration for theBSM No. 1 unit from
that originally filed with the Railroad Commission.  The redesignated BSM No. 1 unit, unlike the
previously designatedBSM No. 1 unit, extended beyond the eastern lineof Hardin
County at Pine Island Bayou into Jefferson County.The certificate, signed by
Lanoue, stated that “this is a true and correct plat based on the best of my
knowledge November 16, 2000.”  

On February
15, 2001, Samson sent the Hooks a letter offering to pool 50 acres covered by
the Hooks’ Jefferson County Leaseinto theredesignated BSM No. 1 gas pooling unit
for the BSM No. 1 well.Attached to the letter was a copy of the plat of the
reconfigured unit Samson had filed with the Railroad Commission in December
2000.

On February
20, 2001, before accepting Samson’s offer to pool—which would require amendment of Article VI of the Hooks’ Jefferson
County Lease to permit pooling—Charles
Hooks, the landowner and an attorney who had participated in a number of oil
and gas deals, called Lanoue and sought more information.  Charles Hooks inquired about the BSM No. 1 well’s
location and about how his property fit in the unit.  Lanoue told him that the well was about 1,500
feet away from Pine Island Bayou, the boundary between Hardin and Jefferson Counties
and the western line of the Hooks’ Jefferson County Lease.  

Hooks requested
a plat showing where his acreage would lie within the proposed reconfigured BSM
No. 1 unit.  That same day, Lanoue sent
Hooksthe scaled plat of the redesignated BSM No. 1 pooling unitthat Samson had filed
with the Railroad Commission in December 2000. 
This plat was certified by Lanoue as “a true and correct plat based on
the best of my knowledge December 28, 2000.”A number of changes had been made
to the March 22, 2000 plat showing the original BSM No. 1 gas pooling unit to
reflect the redesignated unit.  The plat of
the reconfigured unit had different boundaries extending further west and also
further east into Jefferson County, encompassing part of the Broussard tracton
the east that had not been included in the original unit designation.  Theplat had been highlighted to show the location
of the Hooks’ 50 acres east of Pine Island Bayou.

Like the March 2000 plat of the original BSM No. 1 unit,the plat of the
redesignated BSM No. 1 unitcontained the arrow pointing to the location of the
bottom hole, but it gave slightly changed coordinatesfrom those of the proposed
bottom hole of the BSM No. 1 well on the March 2000 plat.  At trial, Lanoue testified that he changed
these coordinates with a ruler.  Also,
instead of a line running from the proposed bottom hole location and showing +1,080
feet to the eastern line of the unitat Pine Island Bayou, the plat showed a
different line to the bayou with an undesignated starting point. The plat also showed
an eastern border of the reconfigured BSM No. 1 unit beyond the bayou and encompassing
a portion of the Hooks’ Jefferson County Lease. 
Above the line was the designation “+1400′.” 
An arrow stating “BHL” and giving the well coordinates pointed to a
point on the line about one quarter of the way from the western starting point
of the line to the eastern end of the line at the bayou. Thus, if the
designation “+1400′” were
interpreted as the distance from the bottom hole to the bayou, the bottom hole
of the BSM No. 1 well would be outside the 1,320 foot buffer zone for the  Jefferson County Lease.  However, if the “+1400′” designation were interpreted as
the distance from the undesignated starting point of the line to the bayou and
the arrow one-quarter of the way along it were interpreted as the bottom hole
location, the bottom hole of the well would be within the buffer zone of the
Hooks’ Lease, triggering Samson’s offset obligations under Article VI(A) of the
Jefferson County Lease.

          In addition, the plat stated:  

The
Bottom Hole Location is:  

290′
FSL x 740′ FEL Survey

500′
Scaled FNL x 1400′+ Scaled′
FEL Unit.

 

This language in the plat
thus expressly stated that the bottom hole of the BSM No. 1well was located
about 1,400 feet from the eastern line of the redesignated BSM No. 1unit, which
encompassed the Hooks’ 50 acres from their Jefferson County Leasebetween Pine
Island Bayou and the eastern edge of the redesignated unit.  According to this notation, the bottom hole
of the BSM No. 1 well was within 1,320 feet of the “leased premises,” and,
therefore, inside the buffer zone for the Hooks’ Jefferson County Lease

          Lanoue testifiedat trial that he added the notation that
showed the bottom hole of the BSM No. 1 well to be + 1,400 feet from the
eastern line of the unit in August 2000 to reflect the newly shaped unit.  He also testified that he got the notation
“740 feet from the east line and 290 feet from the south line” “from myself.”  He did not go to the directional survey which
had been previously completed to determine the exact location of the bottom
hole.  However, he intended the numbers
to be “[a]s accurate as a land guy is using a ruleron a scaled piece of paper
that might not even be to scale.”

Hooks
testified at trial, however, that Lanoue orally told him that the BSM No. 1 well
was 1,500 feet from Pine Island Bayou. 
He then looked at the plat and concluded that the bottom hole location
was approximately 1,400 feet west of Pine Island Bayou and thus outside the
line that would have triggered the 1,320 foot offset provisions in the
Jefferson County Lease. He made no other inquiries regarding the plat or the
bottom hole of the well, and he did not check the records filed with the
Railroad Commission to determine the exact location of the bottom hole.

          After making the pooling offer to the Hooks, Lanoue executed
the designation of the BSM No. 1 pooling unit in February 2001 and recorded it
in the county’s real property records on March 7, 2001, showing the Hooks as
participating in the pool for the BSM No. 1 unit.  However, the Hooks did not actually consent
to pool the 50 acres from their Jefferson County Lease into the BSM No. 1 unituntil
May 25, 2001, and they conditioned their assent on a formal amendment to the
lease which they were to prepare and submit to Samson.  The Hooks did not prepare the formal
amendment, however, and the parties never executed such an amendment.  Instead, the Hooks agreed to a division order
setting out their percentage distribution of the unit’s proceeds, whichstated
that Samson would pay the Hooks royalties based on a stated percentage of their
acreage in the unit to the entire acreage of the BSM No. 1 unit unless notified
otherwise in writing.  

          After the Hooks agreed to be included in the BSM No. 1
unit, Samson sent royalty checks to them for their unit interest continuing
through the time of trial, and the Hooks cashed the royalty checks.  However, the royalty checks did not include additional
compensatory royalties calculated under the terms of Article VI of the Hooks’
Lease for a well drilled within the 1,320-foot buffer zone of theHooks’ Jefferson
County Lease.

After the
Hooks agreed to pool 50 acres of their Jefferson County Lease into the BSM No. 1
unit, Samson drilled a second well, the Joyce DuJay No. 1 well (“DuJay No. 1
well”), within the 1,320-foot buffer zone of the Hooks’ Jefferson County Lease.  That well was completed in January 2002 and
made part of another pooling unit, the DuJayNo. 1 unit, in which the Hooks also
participated and from which they received royalties.  This well was offset by the BSM No. 1 unit.  Hooks testified that he was not defrauded with
respect to the DuJayNo. 1 unit.

2.    
The Hooks’
Hardin County Leases, the BSM A-1 Well and Pooling Unit, and the Hooks’
“Unpooling” Claim

 

          In addition
to their Jefferson County Lease, the Hooks also owned two leases in Hardin
County near the BSM No. 1 well, the 95-acre and 10-acre Hardin County Leases.  Unlike the Hooks’ Jefferson County Lease, these
Leases did provide for pooling in terms that were essentially the same with
respect to the manner and methods of pooling.

          The
Hardin County Leases both contained language calling for an instrument
“identifying and describing the pooled acreage” and stating that a “pooled unit
shall become effective on the date such instrument or instruments are so filed
for record.” Article V(E) of the pooling provision in each Lease also stated
that production from any part of a pooled unit that included the leased
premises was considered production from the leased premises “regardless of
whether . . . such production was secured before or after the date of this
lease or the date of the instrument designating the pooled unit.”  The
95-acre Lease provided in Article V(E) as follows:

E.  Lessee [Samson], at its option, is hereby
given the right and power in its discretion to pool or combine, as to any one
or more formations, the land covered by this Lease or any portion of said land,
insofar only as gas or gas condensate rights are concerned . . . with other
land, lease or leases in the immediate vicinity thereof, except to the extent
and in the manner hereinafter stipulated. 
With respect to any such unit so formed, Lessee shall execute in writing an instrument or instruments
identifying and describing the pooled acreage, and file same for recording in
the office of the County Clerk in Hardin County, Texas; and the pooled unit
shall become effective on the date such instrument or instruments are so filed
for record.  Notwithstanding anything
hereof to the contrary, pooled units
created hereunder and comprising all or part of the herein leased premises shall not exceed the maximum acreage figures
permitted for all production units of oil or gas wells completed at certain
depths under Article V. hereof unless the Railroad Commission of Texas or
any governmental authority having and asserting jurisdiction over the subject
matter thereof prescribes for the
drilling or operation of a well at a regular location, or permits for the
obtaining of the maximum allowable from any well to be drilled, drilling, or
already drilled, larger pooled units than any of those herein permitted,
then any such pooled unit may be established or enlarged to conform to the size
either required of a well or permitted for the obtaining of the maximum
allowable.  For any well drilled on and
completed at depths beneath the surface of a tract covered by this lease there
shall be no pooling with other lands, unless such tract is insufficient, due to
either its lack of size or prior unitization hereunder, to comprise the maximum
acreage figures permitted hereunder in which case all of said tract (95 acres
more or less) or the then un-unitized portion of same shall be so pooled; and
Lessee may include in such pooled unit such other acreage as may be available
to comprise the maximum acreage figures permitted under the terms of this
lease.  For a well drilled on or completed at depths beneath the surface of
lands other than the herein leased premises, not less than all (100%) of the
lands (95 acres more or less) or the then un-unitized portion of same shall be
so pooled; and Lessee may include in such pooled unit such other acreage as may
be available to comprise the maximum acreage figures permitted under the terms
of this lease.

 

Operations for drilling on
or production of gas from any part of the pooled unit which includes all or a
portion of the Leased Premises, regardless of whether such operations for
drilling were commenced or such production was secured before or after the date
of this lease or the date of the instrument designating the pooled unit, shall
be considered as operations for drilling on or production of gas from the
Leased Premises, whether or not the well or wells be located on the Leased
Premises, and the entire acreage constituting such unit or units shall be treated for all purposes, except
the payment of royalties on production from the pooled unit, as if the same
were included in this Lease. The above right and power to pool may be
exercised at any time and from time to time and before or after a well has been
drilled, or while a well is being drilled. 
Lessee may vacate any unit formed
by it hereunder by instrument in writing filed for record in said county at any
time when there is no unitized substance being produced from such unit.  The pooling for gas hereunder by Lessee shall
also pool and unitize all liquid gas, and the royalty interest payable to
Lessor thereon shall be computed the same as on gas.  For the purpose of computing the royalties to
which owners of royalties shall be entitled on production from each production
unit, there shall be allocated to the
applicable separate tract acreage included in such production unit a pro rata
portion of the production produced from such production unit.  Such allocation shall be on an acreage basis;
that is to say, there shall be allocated to the applicable separate tract
acreage within the unit that pro rata portion of the production produced from
the production unit which the number of surface acres covered by such separate
tract and included in the production unit bears to the total number of surface
acres included in the production unit, commencing with the date of first
production from the production unit.

 

(Emphasis added.)

          In February 2001, Samson finished
directionally drilling and completed the BSM A-1 well north of the BSM No. 1 well
on Samson’s own lease in Hardin County (the “Black Stone Minerals/FirnBank
lease”). The mineral interests underlying this lease were owned 87.5% by Black
Stone Minerals and 12.5% by FirnBankas cotenants. 

          Samson did not have the contractual
authority to pool under its leases with either Black Stone Minerals or
FirnBank.  Samson therefore negotiated
with the leaseholders for such a right and concluded that both of the lessors
were in agreement.  Accordingly, on March
12, 2001, Samson filed a Unit Designation for a 704-acre unit called the Black
Stone Minerals “A” No. 1 Gas Unit (the “BSM A-1 unit”).  The BSM A-1 unit designation unitized the
Black Stone Minerals/FirnBank lease, as well as the Hooks’ 10-acre and 95-acre
Hardin County Leases and other tracts, including leases beneath Pine Island
Bayou owned by the State.  The designation
reflected that it was effective as of the date of first production, and it included
a list of the leases pooled, including the Hooks’ Hardin County Leases.  The designation for the BSM A-1 unit included
gas production at all depths between 6,000 and 13,800 feet, although the BSM
A-1 well produced gas only from the shallow EY5 formation.

          FirnBank consented to be pooled into
the BSM A-1 Unit in May 2001.  Samson
also obtained written consent from the Hooks to pool their Hardin County Leases
into the BSM A-1 unit.  In addition, it obtained
the agreement of the Texas General Land Office and the School Land Board
(collectively, the “State of Texas”), who owned adjacent land, to pool that
land into the unit.  However, Black Stone
Minerals, the 87.5% owner of the mineral interests underlying the drillsite,declined
to consent to the pooling unit.

          Samson
drilled and completed the BSM A-1 well, and the well began producingin June
2001 from the depth range of theformationat the horizon from 12,304 to 12,332
feet.In December 2001, Samson finished another gas well, the DuJay No. 1
well.  The DuJay No. 1 well produced from
some of the same landdesignated to the BSM A-1 unit, but it reachedfrom 13,150
to 13,176 feet—a lower
horizon than the BSM A-1 well.  The DuJayNo.
1 well began producing in January 2002. 

          In
February 2002, after failing to receive Black Stone Minerals’ consent to the
BSM A-1 pooling unit, Samson amended the BSM A-1 unit designation.  It executed and recorded a designation for a
new unit, the Joyce DuJay No. 1 Gas unit (“DuJayNo. 1 unit”) that recited an
effective date as of first production of the DuJayNo. 1 well, i.e., January
2002.  The DuJay No. 1 unit designated a
new, smaller, 571-acre unit with a different name, different leases, different
depths and different boundaries from the BSM A-1 unit.  The DuJayNo. 1 unit included some of the
deeper strata of the originally designated BSM A-1 unit, but it excluded the EY5
horizon from which the BSM A-1 well was producing at 12,304 to 12,332 feet.  Instead, the designated DuJay No. 1 unit
pooled its leases as to gas well production from 12,800 feet and deeper,
including some already-pooled depths carved out of the BSM A-1 unit (12,400–13,800
feet) and deeper strata (below 13,800 feet). 
Because of its depth limitations, the DuJayNo. 1 unit included the DuJayNo.
1 well, but not the shallower-completed BSM A-1 well.  The designated acreage excluded most of the
Black Stone Minerals/FirnBank lease, but it included the Hooks’ Hardin County
Leases and the State’s leases.

          Samson
did not get consent from the Hooks to vacate or amend the BSM A-1 unit or to
“unpool” their interests from the BSM A-1 unit or well.  However, it informed the Hooks that the BSM
A-1 unit had been amended and the unit name had been changed.  It stated, “Please note that the Unit
Designation for the Black Stone Minerals ‘A’ No. 1 is being amended and will
now be called the Joyce DuJay No. 1 unit. 
No additional action is needed on your part.”After the BSM A-1 unit was
amended, reconstituted, and renamed the DuJay No. 1 unit, Samson paid, and the
Hooks accepted, royalty payments from pooled production from the DuJay No. 1
well from the date of first production until after commencement of trial in the
instant case.  The BSM A-1 well was
produced as a lease well on Samson’s Black Stone Minerals/Firnbank leases and
was not included in any unit. Samson did not pay the Hooks royalties on the BSM
A-1 well, and the Hooks took no action to enforce any rights with respect to
the original BSM A-1 unit.

          Subsequently,
Samson drilled another DuJay well (the “DuJay A-1well”) and created a separate
pooling unit for that well.  The DuJay
A-1unitdiffered from the DuJayNo. 1 unit by depth limitation and acreage.  The DuJay A-1well began producing on
September 25, 2002.  However, Samson did
not file the DuJay A-1 unit designation until July 2003.  The Hooks’ Hardin County Leases were likewise
pooled into the designated DuJay A-1unit, and the Hooks accepted royalties on
the production from that unitas well from the date of first production until
after trial had begun in the instant action.

3.    
The Hooks’ Hardin County Leases and the “Most Favored
Nation” Clause

 

          The Hooks’
Hardin County Leases also contained a “most favored nation” clause.  This clause provided that, under certain
circumstances, the royalties payable to the Hooks must be elevated to match the
highest royalty payable to Samson’s other lessors.

4.    
The Hooks’ Leases and the “Formation
Production Clause”

Article III(K) of each of the Hooks’ Leases contained a
“formation production clause.”  Article
III provided that the Hooks were to receive as royalties 25% of “the market
value at the wells” on the “gas, including casinghead gas or other gaseous
substances produced from said land,”  or
25% of “the price received therefor by Lessee.” 
Likewise, they were to receive as royalties 25% of “all liquid
hydrocarbons that may be produced from said land.”  Article III(K) provided, “For the purposes of
calculating all royalties payable under Article III herein, it is expressly
provided that all such calculations shall be based on formation production as
reported on Texas Railroad Commission forms P-1 and P-2.”

B.   Procedural
History

1.       Trial
Court Proceedings

In August
2004,several mineral-rights owners who had leased to Samson filed a suit against
Samson styled JoyceDuJay Lee v. Samson
Lone Star.  The plaintiffs, who did
not include the Hooks, complained about pooling issues unrelated to the BSM No.
1 well.  In December 2004, other
landowners, also not including the Hooks, filed a second action, styled Thomas Klorer et al. v. Samson, complaining
about the same issues.  In August 2005,
these two actions were consolidated.

On his
birthday in November 2006, Charles Hooks, as an oil and gas attorney, attended
a seminar for oil and gas attorneys. 
There, he met an attorney who told him he was handling the Klorer and Lee cases against Samson.  

          On
November 16, 2006, the Hooks were added to the consolidated suit in a Fifth
Amended Petition.  This petition alleged
against Samson various breaches of contract and common law and statutory
negligence related to the Hooks’ Jefferson County Lease and theirtwo Hardin
County Leases.  Among other things, the
Hooks claimed that Samson had breached the Jefferson County Lease by not paying
compensatory royalties based on the bottom hole of the BSM No. 1 well being
within 1,320 feet from their Lease.  The Hooksalso claimed that Samson had
improperly “unpooled” the BSM A-1 unit, and they sued to obtain all royalties
they would have received from that unit as if all the lessors, including Black
Stone Minerals, had agreed to pool, to be added to the royalties they received
from the DuJay No. 1 and DuJay A-1 units(the “unpooling claim”).  The
Hooks also asked for a declaratory judgment regarding the construction of the
“most favored nations” clauses in their Leases, which they argued was
triggered by aroyalty paid to the State of Texas under a pooling agreement with
Samson that was higher than the royalty paid to the Hooks under their pooling
agreements.Finally, the Hooks sought the payment of royalties to them on
“formation production” under the terms of all three Leases.The Hooks did not, however, plead any fraud claims
at that time.  

The Hooks added
fraud, fraudulent inducement, and statutory fraudclaimswith respect to the
Jefferson County Lease in a Sixth Amended Petition, filed on May 7, 2007.  The Hooks alleged in the alternative (1) that
their Jefferson County Lease had never been a part of the BSM No. 1 unit
because no agreement to amend that Lease to allow pooling was entered, and,
therefore, they were entitled to damages under the Lease for the loss of their
rights to require Samson either to drill an offset well, pay them compensatory
royalties, or release their acreage,and (2) that Samson had made false
representations to them as to the configuration of the BSM No. 1 unit and the
location of the BSM No. 1 well to induce them to agree to amend the Jefferson
County Leaseto allow a portion of it to be pooled in the BSM No. 1 well and unit(the
“offset obligations claim”).  They
contended that Samson had falselyrepresented“that the [BSM No. 1] (gas) well
was more than 1,320′from the
nearest lease line of the Hooks Jefferson County Lease” so that its offset
obligations were not triggered under the Lease. 
The Hooks claimed that the representations were intended to save Samson
from having to pay themthe substantially greater compensatory royalties that
would have been payable under the terms of the Lease for infringement of the 1,320-foot
buffer zone.

In
September 2007, the trial court severed the consolidated action against Samson into
three different actions, one of which was the Hooks’ action against Samson for
fraud and breach of contract.[5]

          Subsequently, the Hooksmoved for partial summary judgment
on several of their claims based on the terms of their Leases.  The Hooks moved for summary judgment on the
unpooling claim,claiming
that Samson did not have authority to vacate the BSM A-1 unit into which their
Hardin County Leases were pooled and that, therefore, Samson had breached its
lease contract by failing to pay them royalties on the BSM A-1 well.The Hooks
also moved for summary judgment ontheir most favorednation claim, formation
production claim, and offset claims. 
They argued that Samson failed topay them “royalties based on a greater
‘Most Favored Nations’ rate and compensatory royalties on certain offset encroaching
wells.” 

Samson moved for partial summary
judgment on the offset obligations provision, on the formation production
claims, and on the most favored nation claim. 
Samson also moved for summary judgment on the Hooks’ unpooling claim on
the basis of limitations.  

The trial court granted the Hooks’
motion for summary judgment and denied Samson’s motion on the unpooling
claim.  It assessed damages of
$766,626.85 against Samson on the Hooks’ unpooling claim.  

The trial court also granted the
Hooks’summary judgment motion on their claim for breach of the most favored
nations clause in their Hardin County Leasesand awarded them $848,854.01 in
damages.

The trial
court granted Samson’s motion for summary judgment for breach of the offset
obligations provision in the Jefferson County Lease on limistations, and it
denied the Hooks’ corresponding motion. 
The trial court also disposed of some other contract claims by other
partial summary judgment motions.  

In 2008, the
case went to trial solely on the Hooks’ fraud claims with respect to the
Jefferson County Leaseand their formation production claims.  The fraud claims included the Hooks’ claims that
Samson’s landman, Lanoue,had made misrepresentations to them to get them to
allow Samson to add their 50 acressubject to the Jefferson County Lease to the BSM
No. 1pooling unit for the BSM No. 1 well, which was within the 1,320-foot
buffer zone for the Lease.  The Hooks
contended Samson made these misrepresentations to avoid abiding by the terms of
Article VI(A) of theJefferson County Lease, which they contended would have
required Samson to drill an offset well, release their acreage, or pay them
compensatory royalties, and, therefore, they were entitled to damages. The
Hooks also claimed that they were entitled to additional royalties under the
formation production clauses in both their Jefferson County andtheir Hardin
County Leases.

The jury
answered “yes” to the questions of whether Samson committed fraud and statutory
fraud with respect to the BSM No. 1 well. 
It assessed damages against Samson for fraud in the amount of $20,081,638.07.  The jury found that, in the exercise of
reasonable diligence, the Hooks should have discovered Samson’s fraud by
Charles “Hook’s Birthday April 2007.”  It
did not respond, however, to the questions asking for a finding, by clear and
convincing evidence, that the harm to the Hooks resulted from fraud or that Samson
had actual awareness of the falsity of the representations or promise that the
jury had found to be fraud.[6]Therefore, it did not award
exemplary damages.  The jury also did not
respond to the question requesting it to“find beyond a reasonable doubt that
Samson secured execution by the Hooks of a document by deception” and that the
property had a value of $1,500 or more.[7]

Finally,
the jury found that Samson’s failure to pay royalties based on formation
production resulted in underpayment of royalties on all three of the Hooks’ Leases.

The trial
court entered final judgment on the jury’s verdict, awarding the Hooks
$20,081,638.07 for damages proximately caused by Samson’s fraud with respect to
the BSM No. 1 well.  The final judgment
also reaffirmed and incorporated the trial court’s previous summary judgment
rulings in favor of the Hooks.  In
addition to the fraud award, the judgment awarded the Hooks$766,626.85 in damages for the
“unpooling” claim related to the BSM A-1 well, $848,854.01 in damages for
breach of the Leases’ most favored nations clause, and $52,257.22 in damages
related to ad valorem taxes.[8]  Finally, the final judgment included an award
of attorney’s fees, expert witness fees, costs for copies of depositions, and
pre- and post-judgment interest in favor of the Hooks.

2.       Claims
on Appeal

Samson has
appealed the judgment on the trial verdict and the partial summary judgments entered
against it, and the Hooks have cross-appealed the partial summary judgments
entered against them, all of which were incorporated in the final judgment.

          Samson
contends on appeal that the trial court erred in entering judgment on the
jury’s finding that it committed fraud with respect to the Hooks’ Jefferson
County Lease and that it withheld royalties on formation production with
respect to all three of the Hooks’ claims. 
It also contends that the trial court erred in granting the Hooks’
motion for summary judgment on their unpooling claim with respect to the BSM
A-1 well, in granting summary judgment on the Hooks’ claim for royalties under
the most favored nations clause in their Jefferson and Hardin County Leases,
and in denying its own motion for summary judgmenton those claims. Finally,
Samson contends that the trial court erred by granting a permanent injunction
in its final judgment requiring Samson to fulfill certain contract provisions
on pain of contempt of court, that it erred in awarding attorney’s fees to the
Hooks, and that it erred in awarding the Hooks 18% post-judgment interest
compounded annually.

          The
Hooks contend on cross-appeal that the trial court erred in ruling in Samson’s
favor on their claims thatSamson breached the offset obligations clause in the
Hardin County Leases.

C.  
DISCUSSION

1.     The Trial Court’s Judgment on the Hooks’ Fraud Claims
with Respect to the Jefferson County Lease

 

          In
its third issue, Samson contends (1) that there is legally and factually
insufficient evidence to support the jury’s finding that the Hooks could not
have discovered their fraud claimsuntil April 2007 and (2) that the statute of
limitations bars the Hooks’ claim for fraud, fraudulent inducement, and
statutory fraud with respect to the Jefferson County Lease.

          To prove fraud, a plaintiff must show
that the defendant made (1) a material misrepresentation (2) that was either
known to be false when made or was asserted without knowledge of its truth (3)
which was intended to be relied upon (4) which was indeed relied upon and (5)
which caused injury.  Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001).  To prove fraudulent
inducement, these same elements of fraud must be established as they relate to
a contract.  Coastal Bank SSB v. Chase Bank of Tex., N.A., 135 S.W.3d 840, 843
(Tex. App.—Houston [1st Dist.] 2004, no pet.). 
The statute of limitations for fraud is four years.  Tex.
Civ. Prac. & Rem. CodeAnn. § 16.004 (Vernon 2002).

“Statutes
of limitations are intended to compel plaintiffs to assert their claims ‘within
a reasonable period of time while the evidence is fresh in the minds of the
parties and witnesses.’”  Wagner &
Brown, Ltd. v. Horwood, 58 S.W.3d 732, 734 (Tex. 2001) (quoting Computer
Assocs. Int’l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)).  “As a general rule, a cause of action accrues
and the statute of limitations begins to run when facts come into existence
that authorize a party to seek a judicial remedy.”  Provident Life & Accident Ins. Co. v.
Knott, 128 S.W.3d 211, 221 (Tex. 2003). 
In most circumstances, “a cause of action accrues when a wrongful act
causes a legal injury, regardless of when the plaintiff learns of that injury
or if all resulting damages have yet to occur.” 
Id.

The statute
of limitations for fraud is four years.  Tex. Civ. Prac. & Rem. Code Ann. §
16.004(a)(4) (Vernon 2002); Exxon Corp.
v. Emerald Oil & Gas Co., 348 S.W.3d 194, 216 (Tex. 2011).“The statute
of limitations for fraud begins to run from the time the party knew of the
misrepresentation.”  Emerald Oil, 348 S.W.3d at 216; see
also Little v. Smith, 943 S.W.2d 414, 420 (Tex. 1997) (“Generally, in a
case of fraud the statute of limitations does not commence to run until the
fraud is discovered or until it might have been discovered by the exercise of
reasonable diligence.”).

The Hooks
claimed, and the jury found, thatin making their determination to agree to the
pooling of 50 acres of their Jefferson County Lease in the BSM No. 1 unit, they
relied solely on Lanoue’s oral statement that the BSM No. 1 well was about 1,500
feet from their Lease line and on Charles Hooks’ interpretation of the plat of
the BSM No. 1 unit provided to him in response to his conversation with Lanoue
on February 15, 2001.  The Hooksalso contended,
and the jury found, that they did not discover that the bottom hole of the BSM No.
1 well was within their 1,320-foot buffer zone, entitling them to additional
compensation royalties, until well withinthe limitations period as extended by
application of the discovery rule.[9]  Specifically, the Hooks claimed that they
relied onCharles Hooks’ interpretation of the designation “+1400′” on the line on the platof the
redesignated unit drawn from an undesignated point to Pine Island Bayou as
meaning that the bottom hole of the BSM No. 1well was about 1,400 feet, or more
than 1,320 feet, from their Lease, and, therefore, outside the buffer zone.They
did not inquire into seemingly contradictory information in that document
showing an arrow pointing to the bottom hole of the BSM No. 1well about
one-quarter of the way along the 1,400-foot line from an undesignated point to Pine
Island Bayou, the western line of theirJefferson County Lease.  Nor did they inquire intothe notation that
the bottom hole was about 1,400 feet “FEL unit,” i.e., from the eastern line of
the reconfigured BSM No. 1 unit, which included 50 acres of their Jefferson
County Lease.  Both of these notations
would have indicated to them that the bottom hole of the BSM No. 1 well was clearly
within the Lease’s 1,320-foot buffer zone. 
Similarly, the Hooks did not seek available records from either Samson
or the Railroad Commission that would have shown them the actual location of
the BSM No. 1 well’s bottom hole.

Had the
Hooks exercised reasonable diligence, they should have known of the exact
location of the bottom hole when the directional survey was filed with the
Railroad Commission in July 2000.  See Emerald Oil, 348 S.W.3d at 216; Little, 943 S.W.2d at 420. Charles Hooks
was an oil and gas attorney and had participated in more than 100 oil and gas
leases at the time of trial, and he knew that Lanoue had certified the plat
furnished to Hooks as being made on his own knowledge in December 2000,but he
never sought to investigate the results of the directional survey filed with
the Railroad Commission in July 2000, which showed the exact location of the
bottom hole.  Nor did the Hooksconduct
due diligence in seeking the plat of the originally designated BSM No. 1 unit certified
by the surveyor in March 2000, showing the proposed bottom hole of the BSM No. 1
well, which was likewise filed with the Railroad Commission in July 2000.  Both of these publicly available documents
would have shown that the well was proposed to be and was bottomed within the 1,320-foot
buffer zone of the Jefferson County Lease, triggering Samson’s obligations to
them under Article VI(A) of that Lease.Any inquiry into the records available
from the lessee, Samson, or from the Railroad Commission would have shown the
Hooks the actual location of the BSM No. 1 well’s bottom hole in February 2001,
when pooling was first proposed to them. 


The Hooks’
fraud claims were not filed until May 2007, more than six years after pooling
was proposed to them by Samson.  We
conclude that the Hooks knew or should have known information that led to the
discovery of the alleged fraud no later than February 2001, as the necessary
information was a matter of public record at that time.  See BP
Am. Prod. Co v. Marshall, 342 S.W.3d 59, 66 (Tex. 2011) (holding that
information disclosing lessee’s failure to continue good faith efforts to
develop oil and gas lease was available from public records and “from several
other sources, including the lessee”); HECI
Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998) (holding that,
because several sources of information about common reservoirs and operations
are available to royalty owners, including Railroad Commission records,
discovery rule deferring accrual of cause of action does not apply to claims of
royalty owners for damage to common oil and gas reservoir).

The statute
of limitations for fraud begins to run when the claimant knew or could have discovered
the fraud bythe exercise of reasonable diligence. See Little, 943 S.W.2d at 420. 
Thus, the statute of limitations began to run in February 2001, but the
Hooks did not file suit until May 2007, which is well outside the limitations
period.See Emerald Oil, 348 S.W.3d at
216.  We hold that the Hooks’ fraud
claims are barred by limitations as a matter of law.

On
rehearing, the Hooks argue that the issue of when they could have discovered
the fraud was a question for the jury, citing Lesley v. Veterans Land Board,352 S.W.3d 479, 485–86 (Tex. 2011).  That case addressed an alleged mistake in a
reservation of a mineral interest.  Id.  The
supreme court held that there were fact issues as to whether this mistake was
so plain as to charge the grantor with knowledge of the mistake.  Id. at
486. The court concluded, “In these circumstances, it cannot be said that, as a
matter of law, Lesley knew or should have known of the mistake in her deed when
she executed it.  Whether her claim for
reformation is barred by limitations involves disputed facts.”Id. 
This scenario is distinguishable from the present case.

When a
cause of action accrues is normally a question of law.  Emerald
Oil, 348 S.W.3d at202.  Our analysis
of when the Hooks knew or should have known of facts that in the exercise of
reasonable diligence would have led to the discovery of the alleged wrongful
act demonstrates that they should have known of the alleged fraud, as a matter
of law, in February 2001, more than six years before they filed suit.  There is no disputed fact issue here regarding
whether this information was plain enough to charge the Hooks with this
knowledge—it is undisputed that this
information was readily available in Samson’s records and in the records filed
with the Railroad Commission.  Moreover,
there was sufficient information available on the plat of the redesignated BSM
No. 1 unit—namely the information that the bottom hole of the well was “+1400”
feet from the eastern line of the unit that encompassed their 50 acres—that
should have put them on inquiry notice.  Thus,
the reasoning in Lesley does not
apply in this case.

We sustain
Samson’s third issue. 

2.    
Summary
Judgments Entered Against Samson on the Hardin County Leases

 

(a) Samson’s “Unpooling” of the BSM A-1 Unit

In its sixth issue, Samson challenges the trial court’s
summary judgment awarding the Hooks damages on their claim for royalties from
the BSM A-1 unit due to Samson’s improper unpooling of that unit.  

Samson contends that because Black Stone Minerals, the
87.5% owner of the mineral rights on the drillsite tract did not consent to
pooling, (although FirnBank, the owner of a 12.5% interest in the mineral
rights did),the “essential purpose for forming that unit had failed” and the BSM
A-1 unit as originally designated was not formed.  Thus, the amendment of the unit to exclude
the non-consenting drillsite mineral owner, Black Stone Minerals, was
justified.Samson further argues that,after the BSM A-1 unit was amended and
renamed the DuJayNo. 1 unit, the Hooks accepted royalty payments from production
on bothDuJay units, which gave the Hooks a higher percentage of the production
than they would have received under the BSM A-1 unit.  Samson argues that, by accepting the royalty
payments from the DuJay No. 1 well and the DuJay A-1 well, the Hooks accepted
the amendment to the BSM A-1 unit and they understood and acknowledged that the
BSM A-1 unit was not formed.  

Alternatively, Samson argues that, if the amendment to
the BSM A-1 unit was improper, the BSM A-1 unit still exists and the Hooks
should have been paid in accordance with their interests in that unit, not in
accordance with their interest in the two DuJay units, which were improperly
formed.Moreover, it argues that the extent of the unit must be limited to
FirnBank’s 12.5% interest in the drillsite tract because only FirnBank
consented to pool its undivided interest in the gas produced from the BSM A-1
well.

The Hooks argue that the BSM A-1 unit was validly
formed when FirnBank, the owner of a 12.5% undivided interest in the mineral
rights to the drillsite, consented to the unit and that this pooled unit could
not be vacated or amended so long as gas continued to be produced from the BSM
A-1 well.  The Hooks agreed to the
pooling of their Hardin County Leases in the BSM A-1 unit.  Therefore, they argue, they are entitled to
royalties from the BSM A-1 well in addition to the royalties they accepted from
their participation in the DuJay No. 1 and DuJay A-1 pooling units.

An oil and gas lease is a contract and is therefore
interpreted as such.  Tittizer v. Union Gas Corp., 171 S.W.3d
857, 860 (Tex. 2005). When construing a contract, the primary goal of the
courts is to give effect to the parties’ written expression of their
intent.  PG&E Gas Transmission v. City of Edinburg, 59 S.W.3d 225, 227
(Tex. App.—Corpus Christi 2001, no pet.).  The courts will enforce the intentions of the
parties to an unambiguous oil and gas lease as expressed in the lease.  Tittizer,
171 SW.3d at 860.  In determining the
agreement, the court examines all parts of the contract and the circumstances
surrounding its formulation.  Columbia Gas Transmission Corp. v. New Ulm
Gas, Ltd., 940 S.W.2d 587, 591 (Tex. 1996); PG&E Gas Transmission, 59 S.W.3d at 227–28.

With respect to royalty interest owners, “pooling
results in ‘a cross-conveyance of interests in land by agreement among the
participating parties, each of whom obtains an undivided joint ownership in the
royalty earned from the land in the “block” created by the agreement’” and each
of whom receives royalty on the basis of the percentage of that party’s acreage
to the whole block.Browning Oil Co. v.
Luecke, 38 S.W.3d 625, 633 (Tex. App.—Austin 2000, pet. denied) (quoting MCZ, Inc. v. Triolo, 708 S.W.2d 49, 52–53
(Tex. App.—Houston [1stDist.] 1986, writ ref’d n.r.e.)).In other words, pooling
effects a cross-conveyance among the owners of the minerals under the various
tracts in the pool so that all cotenants own undivided interests under the
unitized tract in the proportion that their contribution bears to the unitized
tract.Montgomery v. Rittersbacher,
424 S.W.2d 210, 213 (Tex. 1968).  Thus, when
an oil and gas lease is executed by all of the owners of different mineral
interests in two or more tracts, the royalties payable under the lease will be
pooled, and all royalty interest owners in the land subject to the lease will
share in production, no matter where the well is drilled on the leasehold.  London
v. Merriman, 756 S.W.2d 736, 739 (Tex. App.—Corpus Christi 1988, writ
denied).  

An oil and gas
lessee has no power to pool, however, without the lessor’s express
authorization, usually contained in the lease’s pooling clause.  Tittizer, 171 S.W.3d at 860; Se. Pipe Line Co. v. Tichacek, 997
S.W.2d 166, 170 (Tex. 1999); Luecke,
38 S.W.3d at 634 (holding that lessee’s authority to pool is derived solely
from terms of lease, and lessee has no power to pool absent express
authority).  “For pooling to be valid, it
must be done in accordance with the terms of the methods and purposes specified
in the lease.”  Tittizer, 171 S.W.3d at 860; Tichacek,
997 S.W.2d at 170.  Good-faith pooling
can be exercised multiple times.  See Expando Prod. Co. v. Marshall, 407
S.W.2d 254, 259–60 (Tex. Civ. App.—Fort Worth 1966, writ ref’d n.r.e.).  However, “[t]he lessors’ land may be pooled
only to the extent stipulated in the lease.” 
Tittizer, 171 S.W.3d at 860
(quoting Jones v. Killingsworth, 403
S.W.2d 325, 327–28 (Tex. 1965)).

Joinder by all interest owners is not necessary for a
pooled unit to be valid.  SeeLadd Petroleum Corp. v. Eagle Oil &
Gas Co., 695 S.W.2d 99, 106 (Tex.App.—Fort Worth 1985, writ ref’d n.r.e.); see also Whelan v. Placid Oil Co., 274
S.W.2d 125, 128 (Tex. Civ. App.—Texarkana 1954, writ ref’d n.r.e.) (holding
that tenant in common has right to execute lease on his undivided interest in
common property, notwithstanding nonjoinder of cotenant); Donnan v. Atl. Richfield, 732 S.W.2d 715, 717 (Tex. App.—Corpus
Christi 1987, no writ)(stating that cotenant has right to incorporate pooling
agreement into oil or gas lease without consent or joinder of cotenants,
thereby binding his undivided interest). 
Rather, a tenant in common has the legal right to incorporate a pooling
agreement into an original oil and gas lease without the consent or joinder of
the other cotenants, creating a valid contract binding the undivided interest
of the cotenant making the agreement.  Whelan, 274 S.W.2d at 128.  In such a case, the timely completion of a
producing well under the terms of the pooling agreement and within the unit
area set out in the unitization agreement will serve to continue the lease in
full force and effect so long as gas is being produced in commercial quantities.
Id. 
A cotenant who enters into such a lease binding its royalty interest in
the completed and producing well and who accepts its pro rata share in the
royalties from the well calculated under the terms of the unitization agreement
is estopped to deny the validity of the unitization agreement as to its interest
therein.  Id. at 129.

A lessee cannot unilaterally terminate a unit that has
a producing pooled well.  See Ladd Petroleum Corp., 695 S.W.2d at
106–07.Rather, for a lessee to terminate a unit, either the lessors must agree
to the unpoolingor the lease must expressly authorize such termination.  Id.
at 107; see Williamson v. Mobil Producing
Tex. & N.M., Inc., 737 S.W.2d 917, 921 (Tex.App.—Beaumont 1987, writ
denied) (“So, clearly, the lessee, if it is ‘after the discovery of
the same,’ can change the pooling unit only subsequent to the cessation of
production. . . .”).

When a
mineral interest owner—a lessor—accepts royalty checks from a pooled unit, he has
accepted that unit.  SeeMontgomery, 424 S.W.2d at 214–15.  Under the doctrine of equitable estoppel,
mineral interest owners can not repudiate a unit designation after accepting
royalties attributable to that unit.  Cambridge Prod. Inc. v. Geodyne Nominee Corp.,
292 S.W.3d 725, 732 (Tex. App.—Amarillo 2009, pet. denied).

Here, The Hardin County Leases granted Samson the
authority to pool those leases with other land or leases.  Under that authority, Samson obtained the
Hooks’ agreement to pool their interests with the undivided interests of the
two drillsite lessors, Black Stone Minerals and FirnBank, in the BSM A-1
unit.  One of the two drillsite lessors—FirnBank—consented to the BSM A-1 unit.  In addition, Samson pooled other lands and
its own working interests into that unit.  However, Black Stone Minerals refused to
pool.  Samson had no authority to pool
Black Stone Minerals’ interests without its express consent.  See Tittizer,
171 S.W.3d at 860; Tichacek, 997
S.W.2d at 170; Luecke, 38 S.W.3d at
634.  But it did not lack authority to
form a gas production unit that included the mineral interests of Black Stone
Minerals’s cotenant, FirnBank.  See Ladd Petroleum Corp., 695 S.W.2d at
106; Whelan, 274 S.W.2d at 128.

We agree with the Hooks that the originally designated
BSM A-1unit was validly formed, creating a valid contract bindingFirnBank,the
cotenant making the agreement, and the Hooks. 
SeeWhelan, 274 S.W.2d at 128.  Thus, the Hardin County Leases and FirnBank’s
undivided 12.5% interest in the acreage of the designated unit, as well as the
leases of the other consenting landowners, constituted a valid pooling unit.However,
FirnBank pooled only its own undivided 12.5% interest in the production from
the BSM A-1 unit.  See id. at 129. The BSM A-1 unit that was created for the BSM A-1
well did not include the interest of Black Stone Minerals, who had not
consented to pool its undivided mineral interest in the drillsite lease, as a
lessor.  SeeTittizer, 171 S.W.3d at 860;
Tichacek, 997 S.W.2d at 170; Luecke,
38 S.W.3d at 634.  Neither FirnBank nor the
Hooks had the authority to bind Black Stone Minerals to their own agreement to
pool.  See Montgomery, 424 S.W.2d at 213; Whelan, 274 S.W.2d at 128.

While there was production from the original BSM A-1
unit, Samson had no authority to dissolve that unit.  See
Williamson, 737 S.W.2d at 921. 
Nevertheless, when Black Stone Minerals refused to pool, Samson treated the
BSM A-1 wellas continuing as an independent lease well on the Black Stone
Minerals/FirnBank Lease that was not pooled in any unit. Samson did not pay the
Hooks royalties on the production from the BSM A-1 well, nor did the Hooks
complain that they were not receiving royalties.  Instead, it amended and redesignated the pooling
unit to exclude the BSM A-1 well and the EY5 formation from which it was
producing, which Samson renamed the DuJay No. 1 unit.

Samson pooled the Hooks’ interests and those of the
other interest holders in the originally designated BSM A-1 unit into both the
DuJay No. 1 unit and the DuJay A-1 unit, pursuant to its right under the Hardin
County Leases to exercise pooling authority multiple times, “at any time and
from time to time . . . .”  Samson
notified the Hooks, stating, “Please note that the Unit Designation for the
Black Stone Minerals ‘A’ No. 1 is being amended and will now be called the
Joyce Dujay No. 1 Unit.  No additional
action is needed on your part.”

The amended unit and redesignated pooling unit
included reduced acreage from the Black Stone Minerals/FirnBank leaseas well as
the Hooks’ Hardin County Leases and others from the original BSM A-1 unit,
including the State’s leases.Although the new DuJay No. 1 unit did not include
the horizon from which the BSM A-1 well was producing, it did include deeper
strata that had been included in the original BSM A-1 unit, including the
depths from which the DuJay No. 1 well was producing.  Subsequently, Samsondesignated a second new
gas production unit that overlapped with the original BSM A-1 unit, which it
named the DuJay A-1 unit.  The DuJay A-1
unit included different strata not included in the DuJay No. 1 unit.

The completion of a producing well, the BSM A-1,
within the unit area set out in the unitization agreement served to continue
the leases granted to Samson by FirnBank, the Hooks, and the other landowners
in full force and effect so long as any “unitized substance” continued to be
produced from the BSM A-1 well, subject to unpooling through agreement of the
lessors or through cessation of the production of unitized substance as
provided in the habendum clause of the Hardin County Leases.  See
Ladd Petroleum Corp., 695 S.W.2d at 107; Whelan, 274 S.W.2d at 128. Therefore, Samson’s redesignation of the
BSM A-1 unit constituted a breach of the Hardin County Leases by Samson, as did
its faiure to pay the Hooks royalties on the production from the BSM A-1 well
unless the lessors agreed to the unpooling.

The Hooks took no action to assert
any rights under the originally designated BSM A-1 unit in response to Samson’s
amendment and redesignation of the BSM A-1 unit as the DuJay No. 1 unit and its
subsequent designation of the DuJay A-1 unit until they filed suit for breach
of contract against Samson in November 2006, more than four years from the date
of first production and more than four years from the date the BSM A-1 unit was
amended and redesignated and the Hooks were notified.  Instead, the Hooks expressly agreed to accept
the redesignation and terms of the new units, binding themselves to accept
royalties pursuant to their pro rata share of the royalties from the DuJay No. 1
and DuJayA-1 unitsas calculated under the terms of the DuJay No. 1 and DuJay
A-1 unitization agreements, and they did accept royalties from the production
of both DuJay unitsuntil the time of trial in this case.  

We conclude that, by accepting
royalty checks from the amended and redesignated pooling units, the DuJay No. 1
and DuJay A-1units, which they had been notified replaced the BSM A-1 unit, and
by not asserting any rights to royalties from the original BSM A-1 unit or making
any timely claim against Samson in regard to the amendment and redesignation of
the BSM A-1 unit, the Hooks accepted and ratified the amendment and redesignation
of theunits.SeeFortune Prod. Co. v.
Conoco, Inc., 52 S.W.3d 671, 678 (Tex. 2000) (stating that ratification is
adoption or confirmation by person with knowledge of all material facts of
prior act which he had right to repudiate);Montgomery,
424 S.W.2d at 214–15.

We hold, therefore, that the Hooks
are estopped to assert an interest in royalties from production from the BSM
A-1 well by their ratification of the amended and redesignated BSM A-1 unit.

We sustain Samson’s sixth issue.

(b) The Hooks’ Summary Judgment on the “Most Favored
Nations” Clause in the Jefferson and Hardin County Leases

 

In its seventh issue, Samson claims
that the trial court erred in rendering summary judgment in the Hooks’ favor on
the “most favored nations” lease clause contained in all three of the Hooks’ Leases.  This clause provided that, under certain
circumstances, the royalties payable to the Hooks must be elevated to match the
highest royalty payable toSamson’s other lessors.  Specifically, the clause provides:

XXIX.         MOST FAVORED NATIONS CLAUSE

          If
Lessee shall enter into an oil and gas lease(s) part of which is located within
three (3) miles of any exterior boundary of the subject lands covered by the
Subject Lease, hereinafter referred to as “Third Party Lease,” Lessee shall
notify Lessor of such fact.  If the
reserved royalty or the amount per acre payable for delay rentals, shut-in
rentals or minimum royalty, at any time payable under such Third Party Lease,
is higher than the like royalty and amounts payable as provided in the Subject
Lease, the royalty or amount payable per acre in the Subject Lease, which is
less than that provided in the Third Party Lease shall be immediately increased
so that it will equal the royalty or other amounts payable under the Third
Party Lease.  The subject Lease and the
Third Party Lease must be calculated in substantially the same manner, such
that the comparison of the Subject Lease and the Third Party Lease is based on
the same effective net royalty or other payments, and that same shall include
or deduct the same types of charges, taxes and other burdens from such
interests.

 

The trial
court granted summary judgment in the Hooks’ favor, holding that this clause
was triggered by royalty paid to the State of Texasunder a pooling agreement
with Samson that was higher than the royalty due to the Hooks.  

          It
is undisputed that the State of Texas’s lease under Pine Island Bayou (“State
of Texas Lease”) is a “Third Party Lease” within the meaning of that term in
the most favored nations clause in the Leases in that it covers land located
within three miles of the lands covered by the Hooks’ Leases.  The State, like FirnBank and the Hooks,
originally consented to pooling to form the BSM A-1 unit.  It declined, however, to consent to the
subsequent DuJay No. 1 unit.  In order to
obtain the State’s consent to pool its lease under Pine Island Bayou into theDuJayNo.
1 unit, Samson entered into a pooling agreementwherein Samson became obligated
to pay the State a 28.28896% royalty on production from the DuJay No. 1 well,
as opposed to the 25% it had been paying the State and was paying to the Hooks.  The issue, therefore, is whether the pooling
agreement executed by Samson and the State constitutes a “Third Party Lease,” i.e.,
an oil and gas lease located within three miles of any exterior boundary of any
of the Hooks’Leases with a higher royalty than that provided for in the Hooks’
Leases, so that Samson’s obligation to pay the Hooks increased royalties under
the most favored nations clause in those leases was triggered.

          A
most favored nations clause is “a vendor protection clause [that] enables the
vendor to receive the benefit of increases in the market price of his product
over the term of a long range contract with a purchaser.”  Lone
Star Gas Co. v. Howard Corp., 556 S.W.2d 372, 374(Tex. Civ. App.—Texarkana
1977, writ ref’d n.r.e.).  Such a clause
is enforced according to its terms.  See id. at375–76.  

          The
most favored nations clause in the Leases referred specifically to Samson’s
obligation to pay the Hooks royalty per acre equal to that payable under any
Third Party “oil and gas lease(s) part of which is located within three (3)
miles of any exterior boundary of the subject lands covered by [the Hooks’]
Lease that Samson entered.”Here, however, Samson did not enter an “oil and gas
lease” with the State that required it to pay higher royalties per acre than it
was paying the Hooks under their Leases. 
It entered a settlement agreement, called a “Pooling Agreement,” that raised
only the royalty payable to the State on production from the DuJay No. 1 unit.  

          The
difference between the royalties payable to the State on production from the
DuJay No. 1 unit and the royalties paid to the Hooks did not represent a
difference in the market price of gas at the time the pooling agreement was
entered; nor did it represent a general increase in the royalty rate on the
State’s leases.  It was an amount agreed
upon by Samson and the State to induce the State to accept the amended unit in
place of the BSM A-1 unit and to compensate the State for its loss of royalties
from the BSM A-1 well due to Samson’s amendment and redesignation of the BSM
A-1 unit as the DuJay No. 1, excluding the BSM A-1 well formation.

          We
conclude that, under its plain terms, the most favored nations clause in the Hooks’
Leases does not apply to trigger royalties payable to the Hooks equal to those
payable under the settlement agreement reached betweenSamson and the State.  Therefore, we hold that the trial court erred
in granting the Hooks’ motion for summary judgment for damages under the most
favored nations clause in the Hardin County Leases.

We sustain Samson’s seventh issue.

3.    
The Hooks’ Claims Under the Formation Production
Clause in the Jefferson and Hardin County Leases

 

In its fifth issue, Samson complains
about the jury’s finding, in response to Question Number 8, that Samson’s
failure to pay royalty based on formation production resulted in underpayment
of royalty under the Hooks’ Jefferson and Hardin County Leases and the trial
court’s judgment awarding the Hooks damages based on the formation production
clause in the Leases.  Samson contends
the issue was erroneously submitted to the jury because the construction of the
contractual provision involved was a question of law for the trial court;
therefore,the jury’s response to Question Number 8 is immaterial.  Samson argues that, as a matter of law, the
lease provision in question, properly construed, does not require Samson to pay
for formation production, as this would require it to pay twice for molecules
of gas produced at the surface of the well as liquid condensate. It also
contends that there is legally and factually insufficient evidence that the
Hooks’ Leases required Samson to pay twice for those molecules of gas.  It states that,by giving effect to the jury’s
answer to Question Number 8, the trial court increased all the other categories
of damages assessed against it.

Condensate consists of “hydrocarbons that exist in the
form of gas when contained in the natural gas reservoir underground, which
condense into liquid form when released from the reservoir’s higher pressure
and temperature.”  Bowden v. Phillips Petroleum Co., 247 S.W.3d 690, 704 n.7 (Tex.
2008).  When gas is produced, it goes
through a mechanical separator through which condensate drops out as a liquid
at the wellhead. The Railroad Commission has implemented a system by which
producers report the amount of gas in the reservoir before it is produced.  This system requires producers to use a
formula to calculate the volume of reservoir gas produced at the surface as a liquid.  “Formation production” is thus the
calculation of the total amount of natural gas taken from the reservoir in
whatever form it arrives at the surface, whether in the form of gas or in the
form of liquid condensate. Formation production calculations allow the Railroad
Commission to track the amount of gas coming out of the ground to avoid
overproduction.

Article III of each of the Hooks’ Leases contained
several paragraphs specifying how royalties were to be paid.  It reads in pertinent part:

III      ROYALTIES:

 

Lessors reserve for themselves . . .
the following royalties . . .

 

. . . .

 

B. (1)
On gas, including casinghead gas or other gaseous substances produced from said
land, Twenty-Five percent (25%) of the market value at the wells of such
gas, or Twenty-Five percent (25%) of the price received therefor by
Lessee, whichever is greater . . .

D.   An equal Twenty-Five percent
(25%) part of all other liquid hydrocarbons that may be produced from said land
. . .

          . . . .

 

K. For
the purposes of calculating all royalties payable under Article III herein, it
is expressly provided that all such calculations shall be based on formation
production as reported on Texas Railroad Commission forms P-1 and P-2.

The Hooks base their formation production argument
onArticle III(K).  They contend that
although this provision expressly refers to the entirety of Article III, which
covers payments for both liquids and gas, it requires that all calculations
shall be based on gas as it exists in the reservoir so that royalties must be
paid on liquid condensate both as it is produced in liquid form and as it
exists in gaseous form in the reservoir. 

The interpretation of the formation production provision
in the Hooks’ Leases is a matter of contract construction.  Whether a contract is ambiguous is a question
of law for the court.  J.M. Davidson, Inc. v. Webster, 128
S.W.3d 223, 229 (Tex. 2003).  We construe
the parties’ intentions as expressed in the document, considering the entire
writing and attempting to harmonize and give effect to all of the contract’s
provisions with reference to the whole agreement.  Frost
Nat’l Bank v. L & F Distribs., 165 S.W.3d 310, 311–12 (Tex. 2005).  “We construe contracts ‘from a utilitarian
standpoint bearing in mind the particular business activity sought to be
served’ and ‘will avoid when possible and proper a construction which is
unreasonable, inequitable, and oppressive.’” 
Id.; accord Ace Ins. Co. v. Zurich Am. Ins. Co., 59 S.W.3d 424, 428
(Tex. App.—Houston [1st Dist.] 2001, pet. denied).  If, after the rules of construction are
applied, the contract can be given a definite or certain legal meaning, it is
unambiguous and we construe it as a matter of law.  Frost
Nat’l Bank, 165 S.W.3d at 312.

          Article III of the Hooks’ Leases,
governing the payment of royalties, addresses a number of royalty payment
issues.  In each case, it unambiguously
states that Samson will pay 25% of the proceeds it receives, whether for gas or
for liquids, as royalties to the Hooks unless the proceeds are below market
value, in which case it must pay 25% of market value. In no place do the Leases
state that, having paid royalties to the Hooks from the proceeds it receives on
the sale of gas or liquid condensate, Samson must pay for the condensate a
second time as it existed as gas in the reservoir.  Article III does not state that Samson must
pay a 25% royalty on “formation production” in addition to royalty on gas and
liquids as produced, and we decline to read that provision into the unambiguous
language of the Lease.  See Mann Frankfort Stein & Lipp Advisors
Inc. v. Fielding, 289 S.W.3d 844, 850 (Tex. 2009) (“[T]erms are to be
implied in contract, not because they are reasonable, but because they are
necessarily involved in the contractual relationship, such that the parties
must have intended them and must have failed to express them only because of
sheer inadvertence or because they are too obvious to need expression.”).  We agree with Samson that the unambiguous
meaning of these lease provisions is that the Hooks are entitled to a 25%
royalty on all gas and liquid hydrocarbons at the time proceeds are received
from their sale.   

          We hold that, under its plain
language, the formation production clause in ArticleIII(K) of the Hooks’ Jefferson
County and Hardin County Leases does not operate to double the amount of
royalties owed on the liquid condensate produced from the well.   Therefore, the trial court erred in awarding
the Hooks damages calculated under the formation production clause in their
Leases.

          We
sustain Samson’s fifth issue. 

4.     The Trial Court’s Grant of a Permanent Injunction

          In
its eighth issue, Samson claims that the trial court erred by granting a
permanent injunction in its judgmentthat requires it to fulfill certain
contractual provisions upon pain of contempt of court.  Samson claims that no evidence was presented
of the elements necessary for a permanent injunction.  

The first item of injunctive relief requires Samson to
pay the Hooks royalty on production from the BSM A-1 well commencing with
production after May 2008.  The fourth
item states that Samson shall be liable for all ad valorem taxes on the Hooks’
interests in the oil and gas leases at issue after November 2007, as long as
those leases are in effect. The fifth item requires Samson to provide the Hooks
with certain notices and information “as required by the oil and gas leases in
this case while those leases are in effect.”

A permanent injunction is proper only when there is
evidence of four elements: (1) a wrongful act; (2) imminent harm; (3)
irreparable injury, and (4) no adequate remedy at law.  Jordon
v. Landry’s Seafood Rest., Inc., 89 S.W.3d 737, 742 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied).  The ruling is
reviewed for an abuse of discretion. Id.  Courts do not enforce contractual rights by
permanent injunction unless the complaining party can show an inadequate remedy
at law and irreparable injury.  Cytogenix, Inc. v. Waldroff, 213 S.W.3d
479, 487 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).  Moreover, in order to grant specific
performance of a contract via an injunction, present performance of the
contract’s terms must be possible.  Id.  “A
court should not decree future contractual performance by requiring a party to
perform a continuous series of acts, extending through a long period of time,
over which the court exercises its supervision.”  Id.  Unless a “significant public interest” is
involved, parties to a contract are “left to their remedies at law.”  Id.

The Hooks have failed to cite to us any evidence showing
that they are in danger of imminent harm or irreparable injury from Samson’s
failure to pay them royalties on production from the BSM A-1 well or ad valorem
taxes or failure to provide them with lease notices and information.  Nor have they shown that they have no
adequate remedy at law for their grievances. 
Moreover, at least three of the items of injunctive relief decree future
contractual performance, which is forbidden by Cytogenix.Id.Accordingly,
we conclude that the trial court abused its discretion by including injunctive
relief in its order (1) in the absence of any evidence of the elements of a
permanent injunction and (2) when the injunctive relief decrees future
contractual performance.

We sustain Samson’s fifth issue.

5.    
Attorney’s Fees and Postjudgment
Interest Rate

In its eighth issue, Samson complains
about the grant of attorney’s fees in the final judgment.  The parties stipulated that the Hooks’ right to collect attorney’s fees was contingent on the
Hooks prevailing at trial and on appeal.During trial, the parties also stipulated that Samson owed
the Hooks$52,257.22 related to ad valorem taxes.  Although Samson asked this Court to reverse
the trial court’s judgment “in its entirety,” the parties do not challenge the agreement
as to Samson’s payment of ad valorem taxes. 
However, the Hooks argue on rehearing that Samson’s stipulation
regarding ad valorem taxes means that the Hooks prevailed on a claim, and,
thus, they are entitled to stipulated attorney’s fees under the terms of a
separate pre-trial fee stipulation.

The pre-trial fee stipulation provided
that the stipulated attorney’s fees “are owed to [the Hooks] by [Samson] if
[the Hooks] prevail on any of their claims.” 
The agreement then provided specific exceptions for claims not relevant
here.  The parties made a separate
stipulation during trial that addressed the issue of the ad valorem taxes.

An “agreement between the parties
will not be given greater effect than intended,” and “[a] stipulation will not
be construed as an admission of a fact intended to be controverted.”  Austin
v. Austin, 603 S.W.2d 204, 207 (Tex. 1980). Nothing in the ad valorem tax
stipulation indicated that it was intended to constitute an admission that the
Hooks had prevailed on that issue.  Thus,
the stipulated payment of ad valorem taxes does not entitle the Hooks to claim
attorney’s fees.  See id.Because we
have reversed the portions of the judgment in favor of the Hooks on which they
could claim to be prevailing parties, and upon which their right to attorney’s
fees is contingent, we conclude that the Hooks are not entitled to attorney’s
fees.

We sustain Samson’s eighth issue.

Additionally, in two sentences in its appellate brief,
Samson claimed that “[i]t was error to award postjudgment interest of 18%
compounded annually.  Instead, the
postjudgment interest should be at the same rate as a proper prejudgment
interest rate.”  We asked for and
received supplemental briefing from both parties on this issue.  The supplemental issue, as phrased by Samson,
is as follows: “Should the postjudgment interest rate be 5% as set by Texas
Finance Code § 304.003,
rather than the rate of 18% as stated in the Final Judgment?”  In its supplemental briefing and in its
motion for rehearing filed on March 16, 2012, the Hooks argue that postjudgment
interest should be awarded at the “maximum allowed by law (per the
leases).”  However, the agreement under
which Samson is obligated to pay the ad valorem taxes, the only recovery to
which the Hooks are entitled, is the stipulation entered by the parties during
trial, not the leases.  The ad valorem
tax stipulation does not provide an interest rate.

When the interest rate is not
specified in a contract, postjudgment interest should be calculated based on
the statutory rate provided in Texas Finance Code section 304.003.  See Tex. Fin. Code Ann. § 304.003 (Vernon 2006)
(providing judgment interest rate when interest rate or time price differential
is not in contract).  Section 304.003(b)
provides that, “[o]n the 15th day of each month, the consumer credit
commissioner shall determine the postjudgment interest rate to be applied to a
money judgment rendered during the succeeding calendar month.”  Id.
§ 304.003(b).  Section 304.003(c)
provides that, with exceptions not applicable here, “[t]he postjudgment
interest rate is . . . the prime rate as published by the Board of Governors of
the Federal Reserve System on the date of computation” or “five percent a year
if the prime rate . . . described by Subdivision (1) is
less than five percent.”  Id. § 304.003(c)(1)–(2).  The prime rate is published in the Texas
Register by the Secretary of State.  Id. § 304.004 (Vernon 2006).  This Court may take judicial notice of the
correct, published rate on appeal.  See Office of Pub. Util. Counsel v. Pub.
Util. Comm’n of Tex., 878 S.W.2d 598, 600 (Tex. 1994).

Here, when the trial court entered
its final judgment on December 11, 2008, the judgment interest rate according
to the consumer credit commissioner was five percent.  See Judgment Rate Summary, http://www.occc.state.tx.us/pages/int_rates/Index.html(last
visited May 22, 2012).  Thus, the postjudgment
interest rate on Samson’s obligation to pay the stipulated ad valorem taxes
should be five percent.  See Tex.
Fin. Code Ann. § 304.003(c).

We sustain Samson’s issue on the
postjudgment interest rate.

C. CONCLUSION

 

We reverse the trial court’s final judgment
awarding the Hooks damages on their
fraud, fraudulent inducement, statutory fraud, and formation production claims
and render judgment that the Hooks take nothing by these claims.  We likewise reverse the trial court’s final
judgment as it reaffirms and incorporates its summary judgments on the Hooks’
unpooling and most favored nations claims and render judgment that the Hooks
take nothing by these claims.  Because of
our holding on these issues, we vacate the trial court’s award of attorney’s
fees.  Finally, we vacate the permanent
injunction entered against Samson by the trial court.  We further hold that the proper postjudgment
interest rate is five percent.  

II.   The Hooks’ Cross-Appeal

 

          Before trial, the Hooks and Samson filed cross-motions for
summary judgment on the issue of whether Samson breached the offset obligations
in the Hardin County Leases.  The trial
court granted Samson’s motion and denied the Hooks’ motion on this issue
without stating its reasons.  

          The Hooks filed a cross-appeal claiming,in one issue, that
the trial court erred in granting Samson’s motion for summary judgment and
denying their own.  The Hooks include in
this issue sub-issues regarding the correct interpretation of Samson’s offset
obligations under the Jefferson County and Hardin County Leases, an exception
in the Leases for pre-existing wells, and the statute of limitations.  

          Samson contends that the Hooks have waived their appeal of
the summary judgments by failing to preserve it.  It further argues that the trial court
correctly interpreted the Hardin County Leases with respect to the issues
raised by the Hooks on cross-appeal and correctly rendered summary judgment
holding that the Hooks’ offset claims are contract claims that are barred by
limitations. 

A.   Standard of
Review

          To
prevail on a summary judgment motion, a movant has the burden of proving that
it is entitled to judgment as a matter of law and that there is no genuine
issue of material fact.  Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341
(Tex. 1995).  Neither party herein argues
that a genuine issue of material fact exists which precludes summary judgment; instead,
both claim that, as a matter of law, they are entitled to summary judgment
based on the language of the Leases.

B.  
Statute of Limitations

The Hooks’
claims that Samson breached its offset obligations are breach of contract
claims. The four-year statute of limitations applies to the Hooks’ contractclaims.  See
Stine v. Stewart, 80 S.W.3d 586, 592 (Tex. 2002); HECI Exploration Co., 982 S.W.2d at 885.  “It is well-settled law that a breach of
contract claim accrues when the contract is breached.”Stine, 80 S.W.3d at 592.

Here,
Samson’s alleged breach of its offset obligations occurred ninety days from the
date of first production from the wells in question.  For the BSM No. 1 well, the ninety days ran
in January 2001.  For the BSM A-1 well,
the ninety days ran in September 2001. 
The Hooks did not file suit until November 2006, more than five years
later.  

We conclude
that the Hooks’ cause of action for Samson’s breach of its offset obligations
was barred by the four-year statute of limitations.

Because our
resolution of this issue is dispositive, we do not reach the other sub-issues
raised in the Hooks’ cross-appeal.[10]

We overrule
the Hooks’ issue on cross-appeal.




 

III.          
CONCLUSION

We modify the applicable postjudgment interest rate to
five percent and affirm the portion of the trial court’s judgment awarding the
Hooks $52,257.22 related to ad valorem taxes as stipulated by the parties.  We reverse the remaining portions of the final
judgment of the trial court, including the awardsto the Hooks of $20,081,638.07
for damages proximately cause by fraud, $848,854.01 for damages for breach of
the most favored nations clause, and $766,626.85 for damages for “unpooling”
related to the BSM A-1 well, attorney’s fees, other fees and costs.  We hold that the Hooks take nothing by those claims,
and we vacate the permanent injunction entered against Samson.

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Sharp, and
Massengale.

Justice Sharp, concurring in part and
dissenting in part.











[1]           Originally appealed to the Ninth
Court of Appeals, this case was transferred to this Court by the Texas Supreme
Court pursuant to its docket equalization efforts.  See Tex. Gov’t Code Ann. § 73.001 (Vernon
2005).





[2]           See
Brookshire Bros., Inc. v. Smith, 176 S.W.3d 30, 40 & n.2 (Tex.
App.—Houston [1st Dist.] 2004, pet. denied).

 





[3]           This issue was added at Samson’s
request by order dated June 10, 2010, and both parties were required to and did
file supplemental briefs thereon.





[4]           Article
VI(A) of the Jefferson County Lease provided, in pertinent part, as follows: 

 

[I]n the event a well producing
from a unit not comprised of acreage from the leased premises . . . which has
been classified as “gas” . . . is completed on adjacent or
nearby lands not more than one thousand three hundred and twenty feet (1,320’)
from the leased premises, or draining the leased premises, Lessee covenants and
agrees to, within ninety (90) days from the date production is first sold,
removed or otherwise marketed from said adjacent or nearby producing well,
either (1) commence with due diligence operations for the actual drilling of an
offset well on the leased premises to the base of the formation from which the
adjacent or nearby producing well is producing, (2) pay Lessors as compensatory
royalty, in addition to any royalties currently due, a sum equal to the
royalties which would be payable under this lease on the production from said
adjacent or nearby producing well had same been producing on the leased premises,
or (3) in lieu of drilling such offset well or paying such compensatory
royalty, release by recordable instrument the offset acreage, as hereinafter
defined.  “Offset Acreage,” as used
hereinabove, shall be defined as a unit which would surround such a well if
same were completed on the leased premises; provided, however, that if any
portion of the offset acreage would be included in a producing unit designated
by Lessee hereunder, then if Lessee elects to surrender and release such offset
acreage, it may retain and except from such release the producing stratum or
strata included in such producing unit, but such offset acreage must conform to
the depth, size and shape limitations contained in Paragraph V. herein.  The provisions hereof shall apply regardless
of whether lands upon which offset wells may be located are owned by Lessor or
any of them or not, and with regard to wells located within the hereinabove
prescribed distances from the leased premises, regardless of whether drainage
is actually proved to be taking place or not. 
Notwithstanding anything herein to the contrary, Lessee shall have no
obligations under this Article VI in the event a producing well on nearby or
adjacent land is already offset by a well on the leased premises or on acreage
pooled therewith producing from the same producing horizon from which
production has been secured from any well on nearby or adjacent lands.

 





[5]           The severed lawsuits are Klorer v. Samson Lone Star, No.
B-173,008; Bordages v. Samson Lone Star,
No. B-173,008-A; and Hooks v. Samson Lone
Star, No. B-173,008-B.  Only Hooks has gone to trial.  Klorer
and Bordages remain pending.





[6]           Question Four, the question asking
for a finding that the harm to the Hooks resulted from fraud, and Question
Five, asking for a finding that Samson had actual awareness of the falsity of
the representation, instructed the jury to answer the questions only if it
unanimously answered “yes” to Questions One and Two.  Only eleven of the twelve jurors answered
“yes” to Questions One and Two; therefore, the jury properly refrained from
answering Questions Four and Five.

 





[7]           Question Seven, seeking a finding
that Samson secured execution of a document by deception, instructed the jury
to answer the question only if it unanimously answered “yes” to Question Four
or Five.  Because the jury did not answer
Question Four or Five, it properly refrained from answering Question Seven.

 





[8]           At trial, Samson stipulated that it owed the Hooks
$52,257.22 for ad valorem taxes that the Hooks had paid through November 2007.  This stipulation and the amount of ad valorem
taxes owed by Samson to the Hooks is not challenged on appeal.





[9]           Although the jury found that the
Hooks’ cause of action for fraud accrued on “Hooks’ birthday April 2007,” the
record shows that Hooks’ birthday was in November and that it was on his
birthday in November 2006 that he attended the seminar for oil and gas
attorneys where he first heard about the other mineral-rights owners’ suits
against Samson.





[10]         Likewise, we do not reach Samson’s claims of waiver.